FUSTON v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:FUSTON v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 FUSTON v. STATE
2020 OK CR 4
Case Number: D-2017-773
Decided: 03/05/2020
RONNIE EUGENE FUSTON, Appellant v. THE STATE OF OKLAHOMA, Appellee.
Cite as: 2020 OK CR 4, __ __

 

 

OPINION

LUMPKIN, JUDGE:

¶1 Appellant Ronnie Eugene Fuston was tried by jury and convicted of First Degree Malice Murder (Count I) (21 O.S.Supp. 2012, § 701.7(A)), and Possession of a Firearm After Former Juvenile Adjudication (Count II) (21 O.S.Supp.2012, § 1283(D)), Case No. CF-2013-438, in the District Court of Oklahoma County. In Count I, the jury found the presence of two aggravating circumstances: 1) the defendant created a great risk of death to more than one person; and 2) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, and set punishment at death. In Count II, the jury recommended imprisonment for ten (10) years. The trial judge sentenced Appellant in accordance with the jury's determination and ordered all sentences to run concurrently. Appellant now appeals his convictions and sentences.[1]

 

¶2 Appellant was convicted of shooting and killing Michael Rhodes (the decedent) on October 20, 2012, as the decedent and his three (3) year old daughter sat on the couch in their Oklahoma City home. The crime was the result of an ongoing dispute between the decedent's niece, Brittany Dillard, and a group of girls associated with the 107 Hoover Crips street gang.

 

¶3 Prior to the shooting, the decedent and his wife opened up their home to seven (7) of his great nephews and nieces, who had been in the custody of the Department of Human Services. One of those nieces, Ms. Dillard, had been asked to leave the Rhodes' home because of behavior problems, but shortly before October 20, she was allowed to return. At the time of the shooting, Dillard was in a relationship with Terrell Howard, a Crips member. On October 19, 2012, Dillard became involved in a verbal altercation over the telephone with several women who answered her call to Howard's cell phone. These women, members of a subset of the 107 Hoovers known as the "Dulxw Girls", included Atiana Jordan (whose gang name was "Lady Bucky") and Taneecia Pennon (whose gang name was "Lady Get One"). They escalated the altercation by repeatedly calling Dillard on her cell phone, threatening her and her baby, and offering to fight Dillard. The women drove by the Rhodes' home more than once. An anxious Dillard called Chris O'Neal, the father of her baby, and a member of the Bloods street gang. O'Neal drove to the Rhodes' home and fired gunshots at the Dulxw women. Jordan and Pennon called Dillard about the shooting and returned to the Rhodes' home, throwing rocks at the house and breaking two windows.

¶4 Returning home to find the broken windows, and concerned by what Dillard had told them, the Rhodes called the Department of Human Services and had the foster children picked up for their own safety. Dillard left the residence, to stay with O'Neal's mother, and Mrs. Rhodes and her daughter left the residence for the night.

¶5 Sometime late on the 19th or early on 20th of October, the tires on the Rhodes' car parked in their driveway were slashed. The police were called and investigated the situation. Mrs. Rhodes spoke with Dillard about the situation and learned that Dillard continued to get phone calls and Facebook messages from the Dulwx women. Mrs. Rhodes also received numerous phone calls on her home phone from the Dulwx women. She repeatedly told them that Dillard was not at their home and the women should not come back to the house.

¶6 The evening of October 20, Mrs. Rhodes went out to dinner with a friend while the decedent stayed home with their daughter and nineteen (19) year old son, Jalon. The decedent was on the couch with his sleeping daughter while his son was upstairs playing videogames. He was just about to fall asleep when the front door burst open and Appellant and his companions entered the house firing weapons.

¶7 A few hours earlier, Jordan and Pennon called Appellant, a close friend and fellow member of the Hoover Crips. Despite the fact Appellant lived in Enid, the Dulwx women asked him to come to Oklahoma City because of their conflict with Dillard. Appellant, accompanied by Brian Butler, drove to Pennon's Oklahoma City apartment. Appellant, Butler, Jordan, Pennon, Howard, and another "young guy" drove in two (2) cars to south Oklahoma City to "rob some Mexicans." When that effort did not prove fruitful, the group drove to the Rhodes' home looking for Dillard. As they drove, Appellant communicated with Pennon, who was in a different car. The two cars stopped at a church near the Rhodes' residence and all but Butler got out and talked. The group then got back in the two cars and drove near the Rhodes' residence, parking down the street near a stop sign. Appellant told the "youngster" to get in the driver's seat of his car while Butler waited in the passenger seat. Appellant, Pennon, Howard, and Jordan walked up to the residence. Gunshots rang out and Appellant and Jordan ran back to the car. Initially reluctant to get into the car, Jordan was pulled into the car by Appellant, telling him "they were supposed to kill everybody in the house."

¶8 Upon hearing the gunshots, Jalon ran downstairs to find the front door open, his sister crying, and his father falling off the couch. Jalon sat his father up and called 911. The decedent had been shot three (3) times. The fatal shot entered his left shoulder before striking his aorta and both lungs. His blood sprayed on his young daughter, but she had not been struck by the gunfire. She later told police that the "monsters hurt my daddy."

¶9 After leaving the Rhodes' home, Appellant and his companions dropped Jordan off at her home then went to the home of Butler's cousin. There, Appellant washed his hands in gasoline and told Butler that he fired four (4) shots, and that "the dude was getting up or reaching for something." Appellant routinely carried a .45 caliber Taurus handgun. He had this weapon with him after the murder at the home of Butler's cousin and when he returned to Enid.

¶10 Appellant and Butler drove back to Enid during the early morning hours of October 20. During that time, Appellant changed his cell phone number. When Butler told him the murder would come back to "haunt" him, Appellant became angry and said he was tired of people telling him what to do and how to live his life. In the days and weeks that followed the murder, Appellant told Butler that "the dude" had died but the "girl", presumably Dillard, would not testify because they were going to "handle it on the streets."

¶11 After his arrest, Appellant denied being near the Rhodes' home at the time of the murder but his cell phone records placed him in the area. Other evidence established his relationship with Jordan and Pennon. A phone call from Appellant while in jail to his cousin Treylon Haley led police to the murder weapon -- a .45 caliber Taurus.

¶12 Based upon this evidence, the jury convicted Appellant of first degree malice murder. In the punishment phase of trial, the State sought the death penalty as punishment for the decedent's murder and presented evidence supporting two (2) aggravating circumstances: 1) the defendant created a great risk of death to more than one person; and 2) the existence of a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. See 21 O.S.2011, § 701.12(2) & (7). 

¶13 In addition to incorporating all of the first stage evidence, the State presented evidence to support the alleged aggravating circumstances. The State's evidence showed that in 2009, Appellant assaulted a fellow student and stole a cell phone. In September 2012, approximately one month before the decedent's murder, Appellant fired his weapon in a drive-by shooting in Oklahoma City striking the victim in the back. In December 2012, shortly after the decedent's murder, Appellant shot and killed Heath Crites in Enid, Oklahoma. The State's evidence also showed multiple instances where Appellant attacked and assaulted other inmates while imprisoned.

¶14 In mitigation, the defense presented eight (8) witnesses. These included Appellant's mother, sister, and twin brother; his Juvenile Affairs probation officer; staff members from Varangon Academy, a juvenile treatment center; and psychologist Dr. Terese Hall. After hearing all of the evidence in aggravation and mitigation, the jury found the existence of two alleged aggravators and sentenced Appellant to death. The trial court sentenced accordingly. Appellant now raises fifteen (15) propositions of error in his appeal of his judgement and sentence.

FIRST STAGE ISSUES

¶15 In his first proposition of error, Appellant contends the trial court erred in denying his request for a hearing to determine whether his "intellectual disability" excludes him from the class of offenders eligible for the death penalty.[2] Our review is solely upon a question of law, therefore we review the trial court's interpretation of the law de novo. Murphy v. State, 2012 OK CR 8, ¶ 8, 281 P.3d 1283, 1287; Smith v. State, 2007 OK CR 16, ¶ 40, 157 P.3d 1155, 1169.

¶16 The United States Supreme Court has held that an individual who is mentally retarded may not be executed. Atkins v. Virginia, 536 U.S. 304, 321 (2002). The Court recognized that an IQ score of 75 is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." Id. at 309 n.5. It was left to the individual states to develop procedures to identify mentally retarded defendants and exempt them from the death penalty. Id. at 317.

¶17 In 2006, the Oklahoma Legislature adopted procedural and substantive criteria to implement Atkins. See 21 O.S.Supp.2006, § 701.10b. To meet the threshold requirement of Section 701.10b, the defendant must show an IQ score of "70 or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist" and that "the onset of the mental retardation must have been manifested before the defendant attained the age of eighteen (18) years." 21 O.S.2011, § 701.10b(B) & (C). See also Murphy, 2012 OK CR 8, ¶ 10, 281 P.3d at 1288. The statute further provides:

. . . in no event shall a defendant who has received an intelligence quotient of seventy-six (76) or above on any individually administered, scientifically recognized, standardized intelligence quotient test administered by a licensed psychiatrist or psychologist, be considered mentally retarded and, thus, shall not be subject to any proceedings under this section.

21 O.S.2011, § 701.10b.

¶18 The record in this case shows that Appellant scored an 81 on an IQ test, Woodcock-Johnson III, administered when he was twelve (12) years old. A test given four years later resulted in a score of 67. However, testimony showed that was not a full-scale IQ test and the result was determined to be only an estimated IQ score. After the twenty (20) year old Appellant was charged with first degree murder in January 2013, he was administered four (4) IQ tests from March 2014 through June 2015, resulting in scores of 59, 80, 69 and 75, respectively.

¶19 Prior to trial, Appellant filed a Notice of Intent to Rely on 21 O.S. § 701.10B and Request for Evidentiary Hearing and Dismissal of Bill of Particulars asserting that he was exempt from the death penalty by virtue of his "mental retardation (intellectual disability)" and requesting an evidentiary hearing. In support of this request, the defense argued that Appellant scored a 67 on an IQ test when he was fifteen (15) years old and that he had adaptive functioning deficits.

¶20 In a subsequent pleading, the defense acknowledged that Appellant had scored an 81 on the Woodcock-Johnson III test at age 12, but claimed the test was not a full-scale IQ test. The defense argued that testing done subsequent to that date yielded lower scores and therefore the court was obligated to look at the totality of the evidence to determine whether an Atkins hearing was warranted.[3]

 

¶21 The State objected to the hearing based on Appellant's score of 81, arguing in part that Appellant's score precluded an Atkins hearing under Section 701.10b and that the Woodcock-Johnson III test was a scientifically recognized, standardized intelligence quotient test which gives an overall IQ score. At a subsequent hearing where only argument was presented, the trial court ruled, based upon Murphy, that Appellant was not entitled to an Atkins hearing. A renewed request for an Atkins hearing was made closer to trial but was denied by the trial judge. Now on appeal, Appellant urges this Court to find Section 701.10b unconstitutional and argues that cases from the U.S. Supreme Court decided since Murphy entitle him to an Atkins hearing.

 

¶22 It is a well established principle that statutes are presumed to be constitutional, and the party challenging the constitutionality of a statute has the burden of proving it is unconstitutional. Murphy, 2012 OK CR 8, ¶ 32, 281 P.3d at 1292. This Court has previously found Section 701.10b constitutional. Id. 2012 OK CR at ¶ 40, 281 P.3d at 1293. Appellant relies on the following cases to support his argument to the contrary: Hall v. Florida, 572 U.S. 701 (2014); Brumfield v. Cain, 135 S.Ct. 2269 (2015); and Moore v. Texas, 137 S.Ct. 1039 (2017). These cases do not afford him relief.

¶23 In Hall, the Supreme Court considered a Florida statute, which prohibited further inquiry into a defendant's alleged intellectual disability/mental retardation unless the defendant had at least one IQ score of 70 or below. The Court found the statute unconstitutional as it did not account for the standard error of measurement (SEM) in evaluating an Atkins claim. Id. 572 U.S. at 712, 721. The SEM "reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score." Id. at 713. The SEM for IQ tests is generally considered to be plus or minus five points. Id. The Supreme Court noted that "[b]y failing to take into account the SEM and setting a strict cutoff at 70, Florida 'goes against the unanimous professional consensus'" and misconstrues Atkins. Id. at 722, 724.

¶24 Section 701.10b(C) of the Oklahoma statutes explicitly directs courts "[i]n determining the intelligence quotient, the standard measurement of error for the test administered shall be taken into account." 21 O.S.2011, § 701.10b(C). "By directing that no defendant be considered mentally retarded who has received an IQ score of 76 or above on any scientifically recognized standardized test, the Legislature has implicitly determined that any scores of 76 or above are in a range whose lower error-adjusted limit will always be above the threshold score of 70." Smith, 2010 OK CR 24, ¶ 10, 245 P.3d at 1237. See also Smith v. Duckworth, 824 F.3d 1233, 1245 (10th Cir.2016) ("[b]ecause the statute's [§ 701.10b] cutoff score excludes only those whose SEM-adjusted IQ score would fall outside the generally accepted range for intellectual disability, Oklahoma's statutory regime accounts for the SEM as required by Hall.") Hall does not support Appellant's claim that Section 701.10b is unconstitutional.

¶25 In Brumfield, the defendant sought a post-conviction Atkins hearing based on evidence presented in mitigation at his trial. The trial court dismissed the hearing request based on the defendant's IQ score of 75 and found that he had failed to demonstrate impairment in adaptive skills. On appeal, the Supreme Court found the 75 IQ score, the only score in evidence, and accounting for the SEM, put the defendant "squarely in the range of potential intellectual disability." Id. 135 S.Ct. at 2278. The Supreme Court held that "[t]o conclude, as the state trial court did, that Brumfield's reported IQ score of 75 somehow demonstrated that he could not possess subaverage intelligence therefore reflected an unreasonable determination of the facts." Id. The Court noted that in Atkins, "'an IQ between 70 and 75 or lower [sic] is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.'" Id. 

¶26 Brumfield does not call into question Section 701.10b. Neither does it support the claim that the trial court's denial of the Atkins hearing was in error. Brumfield, unlike Appellant, did not have an IQ score that was outside the SEM for a score of 70.

¶27 In Moore, the Supreme Court reversed the lower court's decision that the defendant, whose adjusted IQ score of 74 fell below 70, did not qualify as intellectually disabled under Atkins. The Supreme Court found the lower court's decision irreconcilable with Hall, stating that based upon the defendant's adjusted score falling under 70, the lower court should have considered the defendant's adaptive functioning. Id. 137 S.Ct. at 1049.

¶28 The Supreme Court further noted that the lower court had improperly relied on state precedent emphasizing nonclinical factors and lay perception of intellectual disability over current medical diagnosis and prevailing clinical standards. The Supreme Court found the factors considered in the lower court's decision "'creat[e] an unacceptable risk that persons with intellectual disability will be executed.'" Id. 137 S.Ct. at 1051 (quoting Hall, 134 S.Ct. at 1990).[4]

 

¶29 Appellant argues this Court runs the same "unacceptable risk" by its failure to grant him an Atkins hearing to further develop the issues. Specifically, he argues he was denied the opportunity to challenge the validity of the Woodcock-Johnson III score. Relying primarily on testimony given at trial by Dr. Terese Hall, he asserts he should have been able to argue to the court that the 81 IQ score was not valid.

 

¶30 The record does not support Appellant's claim. At least two hearings were held to determine the necessity of an Atkins hearing. The first hearing was held in response to the State's motion to compel Appellant's evaluation by the State's psychiatrist. The parties agreed that the purpose of the hearing was to gather information to determine if an Atkins hearing was necessary. The State announced that in addition to argument, Dr. Shawn Roberson, a licensed forensic psychologist, was present to testify. Defense counsel announced that Dr. Terese Hall, also a licensed forensic psychologist, was present.

¶31 The focus of the arguments and testimony was whether a psychological evaluation of Appellant could be properly conducted in light of the closeness in time to the most recent tests. Dr. Roberson testified for the State, stating in part that to ensure accurate results, Appellant should not be evaluated for approximately nine months to one year.

¶32 The defense did not raise a challenge to the 81 score. Dr. Wall was not called to testify. At the conclusion of the hearing, the court granted the State's request to compel Appellant to submit to testing, under the proviso that the test should not be conducted for approximately nine months to one year.

¶33 At a subsequent hearing, held approximately a year later, the State announced its intention to rely on the 81 score from the Woodcock-Johnson test. Defense counsel specifically stated she had no dispute with the 81 score. Counsel argued that the law required the court to consider the other scores. No witnesses were presented at this hearing. At the close of the hearing, the court denied Appellant's request for a pre-trial Atkins hearing.

¶34 As this record shows, no motion or argument challenging the validity of the 81 IQ score was ever presented to the trial court. There is no indication in the record that the defense was denied the opportunity to present any evidence challenging the validity of the Woodcock-Johnson III test score. To the contrary, the record shows Appellant's argument has consistently been that the trial court was required to look beyond the 81 score and consider the totality of the circumstances in determining whether an Atkins hearing was necessary.

¶35 Appellant asserts that the Moore Court referred to Hall as holding that "a state cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70". That is a correct but incomplete statement. The Supreme Court reiterated in Moore, "Hall instructs that, where an IQ score is close to, but above, 70, courts must account for the test's 'standard error of measurement.'" Id. 137 S.Ct. at 1049. The Supreme Court noted,

[W]e do not end the intellectual-disability inquiry, one way or the other, based on Moore's IQ score. Rather, in line with Hall, we require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits.

137 S.Ct. at 1050.

¶36 Oklahoma law, and specifically Section 701.10b, adhere to this principle. Moore does not call Section 701.10b into question. None of the authority relied upon by Appellant holds that a person with an IQ score of 81, (obtained before the age of 18 as Appellant), whose SEM yields a range of 76 to 86 is entitled to an Atkins hearing. Supreme Court decisions subsequent to Atkins have consistently held that mental retardation involves an IQ score within the range of 65-75. The cutoff score of 76 set forth in § 701.10b, taking into account the standard error of measurement, clearly comports with the Supreme Court's Eighth Amendment jurisprudence. Appellant has failed to rebut the presumption that Section 701.10b is constitutional.

¶37 Further, he has failed to show any error in the trial court's denial of his request for an Atkins hearing. The record shows Appellant received a score of 81 on an individually administered, scientifically recognized, standardized intelligence quotient test administered by a licensed psychiatrist or psychologist when he was twelve (12) years old. A test given four years later resulted in a score of 67. However, testimony showed that was not a full-scale IQ test and the result was determined to be only an estimated IQ score. The remaining four (4) IQ scores were the results of tests given after the then 20 year old defendant was charged with first degree murder. Evidence was also presented that Appellant understood he had to have an IQ score below 75 to escape eligibility for the death penalty.

¶38 Based upon the record in this case, the pre-trial evidentiary hearing set forth in § 701.10b(E) was not required. The trial court properly denied Appellant's request for a full Atkins hearing. This proposition is denied.

¶39 In Proposition II, Appellant contends the trial court erred in denying his motion to suppress evidence regarding cell site location information (CSLI). He argued, as he does now on appeal, that obtaining the evidence by a court order rather than a search warrant supported by probable cause violated his Fourth Amendment right against unreasonable search and seizure.

¶40 Investigators obtained CSLI from T-Mobile and Verizon for phone numbers associated with Appellant and a phone shared by Jordan and Pennon (Jordan/Pennon) by a court order pursuant to 18 U.S.C. § 2703(d), the Stored Communications Act (SCA). This Act requires the Government to show reasonable grounds for believing that the records are relevant and material to an ongoing investigation. 18 U.S.C. § 2703(d). Analysis by the Oklahoma City Police Department showed that the cell number associated with the Jordan/Pennon phone was near the Rhodes' home when it was vandalized on October 19, and again on October 20, around 11:42 p.m., the time the 911 call was made regarding the murder. The phone associated with Appellant was shown to be traveling concurrently with the Jordan/Pennon phone on October 20, including being in the vicinity of the Rhodes' home at the time of the 911 call.

¶41 Fourth Amendment rights are personal, may not be asserted on behalf of another, and will be enforced only where a search and seizure infringes on a defendant's own rights. State v. Marcum, 2014 OK CR 1, ¶ 7, 319 P.3d 681, 683 (citing Rakas v. Illinois, 439 U.S. 128, 133--34 (1978)). To properly raise an objection under the Fourth Amendment, Appellant must prove he exhibited an actual, subjective expectation of privacy, which society is prepared to recognize as reasonable, in the area searched. Id. Appellant cannot show a reasonable expectation of privacy in the Jordan/Pennon cell phone or the CSLI obtained from it. Therefore, Appellant has no standing to object to any information obtained relevant to that phone.

¶42 We review the trial court's denial of the motion to suppress the CSLI from the Appellant's phone for an abuse of discretion. Bramlett v. State, 2018 OK CR 19, ¶ 10, 422 P.3d 788, 793. An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue or a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. State v. Delso, 2013 OK CR 5, ¶ 5, 298 P.3d 1192, 1194.

¶43 In Carpenter v. United States, 138 S.Ct. 2206 (2018), the Supreme Court said that an order for CSLI issued under Section 2703(d) is a search within the meaning of the Fourth Amendment. Id. 138 S.Ct. at 2217. The Court reasoned that Carpenter had a legitimate expectation of privacy in at least seven (7) days of CSLI associated with his cell phone. Id. 138 S.Ct. at 2221. The Supreme Court held that before compelling a wireless carrier to turn over a subscriber's CSLI, the Government had to get a warrant. Id.

¶44 The State asserts that the present case is distinguishable from Carpenter as only two (2) hours of CSLI was obtained from Appellant's phone, and that Carpenter expressly left open the question of whether CSLI records may be obtained for a limited period of time before an individual's expectation of privacy is violated. Carpenter declined to say whether there was "a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny." Id. 138 S.Ct. at 2217 n.3.

¶45 Here, as in Carpenter, law enforcement obtained a court order under the SCA, and that court order authorized the collection of CSLI information from Appellant's cell phone. However, Carpenter was decided approximately one year after Appellant's trial. At the time law enforcement in this case obtained CSLI from Appellant's phone, the SCA was a recognized permissible means of accessing the information. In mid-2017, the Supreme Court had not established that an SCA order for CSLI was a search within the meaning of the Fourth Amendment. The officers in this case therefore had an objectively reasonably good faith belief that no warrant was required to obtain the CSLI from Appellant's phone.

¶46 The purpose of the exclusionary rule is to deter police misconduct. Stewart v. State, 2019 OK CR 6, ¶ 16, 442 P.3d 158, 164 (citing Illinois v. Krull, 480 U.S. 340 (1987)). Where there is no demonstrable police misconduct there is nothing to deter by suppressing evidence. Id. Even though it is now established that the Fourth Amendment requires a warrant for the search and seizure of CSLI, exclusion of that information is not required in this case. The information was collected in good faith, and its exclusion would have no deterrent effect. The trial court did not abuse its discretion in denying the motion to suppress the CSLI obtained from Appellant's phone. This proposition is denied.

¶47 In Proposition III, Appellant contends his Sixth Amendment right to confront the witnesses against him was violated by the trial court's limitation of his cross-examination of prosecution witness Brian Butler. Prior to trial, the trial court sustained the State's motion in limine to prevent the defense from cross-examining Butler regarding an arrest on drug charges and indictment in the federal court of Alaska. This arrest occurred in 2017, approximately three (3) years after his testimony at Appellant's preliminary hearing and one month before Appellant's trial. During trial, the defense renewed its objection to the court's ruling at which time the court admitted as Court's Exhibit 6, an offer of proof by the defense. Court's Exhibit 6 states in pertinent part it is expected that Butler would seek to use his testimony against Appellant to his advantage in his pending federal proceedings. The Exhibit also states that "[i]t is expected that Mr. Butler would testify that he currently has no agreement with anyone so far as this regard."

¶48 Now on appeal, Appellant argues the trial court's limitation on cross-examination prevented him from presenting to the jury the continued bias and motivation of Butler to fabricate his testimony. He asserts the jury should have been allowed to hear that Butler: 1) was receiving benefits from his cooperation in multiple jurisdictions including the federal courts in Alaska and Washington; and 2) that his testimony changed substantially around the time of the preliminary hearing as he was facing revocation in federal court. Appellant's reliance on Dodd v. State, 2000 OK CR 2, ¶ 23, 993 P.2d 778, 783-84 is misplaced as Dodd concerns the testimony of jailhouse informants. Butler was not a jailhouse informant.

¶49 "The Sixth Amendment guarantees a defendant the right to cross-examine witnesses; it also allows a trial judge to place reasonable limits on cross-examination." Thrasher v. State, 2006 OK CR 15, ¶ 7, 134 P.3d 846, 849 (citing Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)). See also Mitchell v. State, 2011 OK CR 26, ¶ 58, 270 P.3d 160, 176 (overruled on other grounds, Nicholson v. State, 2018 OK CR 10, 421 P.3d 890). "Not all limitations on the cross-examination of a prosecution witness run afoul of the right of confrontation." Thrasher, 2006 OK CR 15, ¶ 7, 134 P.3d at 849. "Trial judges have wide latitude to impose reasonable limits on such cross-examination based on concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Id. We generally review a trial judge's limitations on the extent of cross-examination for an abuse of discretion. Id. 2006 OK CR 15¶ 8, 134 P.3d at 849.

¶50 "[E]xposure of a witness' motivation in testifying is a proper important function of the constitutionally protected right of cross-examination." Beck v. State, 1991 OK CR 126, ¶ 11, 824 P.2d 385, 389 (citing Van Arsdall, 475 U.S. at 683). However, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Van Arsdall, 475 U.S. at 679 (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)). "Thus, a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" Beck, 1991 OK CR 126, ¶ 11, 824 P.2d at 389 (quoting Van Arsdall, 475 U.S. at 680).

¶51 The record indicates the defense thoroughly cross-examined Butler as to any alleged bias. On direct examination, Butler testified that he had been arrested for drug trafficking in Garfield County in November 2012. It was after this arrest that Butler contacted the Oklahoma City Police Department regarding the Rhodes murder. Butler testified he hoped for leniency in exchange for his information against Appellant but was informed by detectives that they could not make any promises. Butler was released from Garfield County after his testimony against Appellant but was then picked up by United States Marshals on a supervised release warrant for a federal drug conviction from Washington State. Butler testified he had two other felony convictions for drug crimes. Butler admitted that he initially told detectives that he merely heard about the decedent's murder, but at the preliminary hearing, he testified he was in the car with Appellant at the time of the murder.

¶52 On cross-examination, Butler admitted that he spent the first ten (10) minutes of his interview with detectives attempting to make sure he would get something in return for his information about the murder. He explained that he was under federal supervision for a conviction from Alabama, but the supervision had been transferred to Washington by the time he left without the approval of his parole officer, and that he committed several other violations of his parole on his way to Enid, Oklahoma. Butler stated that once he was taken back to Washington, his federal supervision was reduced from two years to one year. He also admitted that he made a deal to get drug trafficking charges in Garfield County dropped in exchange for his testimony against Appellant.

¶53 While the above is not a complete recitation of Butler's testimony, it shows the jury was well aware of Butler's involvement with the criminal justice system -- both state and federal proceedings against him and his dishonesty with the detectives in the present case. Evidence of Butler's arrest in Alaska was cumulative. The exclusion of that evidence did not prevent the defense from challenging Butler's credibility. Appellant has failed to show that had the jury been informed of the Alaska arrest or any additional criminal proceedings against Butler that they would have had a significantly different impression of Butler's credibility. Further, despite Appellant's claim to the contrary, we find that Butler's testimony did not substantially change from the time of the preliminary hearing, before the Alaska arrest, to the time of Appellant's trial.

¶54 The record shows the jury was presented sufficient information to allow it to evaluate the truthfulness of Butler and his motivation and/or bias in testifying against Appellant. We find no Sixth Amendment violation. The trial court did not abuse its discretion in its limitation on cross-examination. This proposition of error is denied.

¶55 In Proposition IV, Appellant contends the State withheld evidence that prosecution witness Ivan Williamson had an agreement by which he was to receive leniency in federal proceedings in exchange for testimony against Appellant. He argues that while the trial court sustained his discovery motion requesting, in part, all agreements between the State and its witnesses reflecting any special or lenient treatment in exchange for their testimony, the State failed to turn over information on pending federal charges, and that this failure to disclose impeachment evidence denied him his due process rights under Brady v. Maryland, 373 U.S. 83 (1963). [5]

 

¶56 The State's evidence showed that at Appellant's direction, Williamson retrieved Appellant's .45 caliber Taurus from Appellant's mother's property and ultimately sold it. The purchaser, Casey Oakley, contacted police and turned it into law enforcement. Subsequent testing showed the weapon to be the gun used to kill the decedent. Williamson testified that he was appearing at Appellant's trial pursuant to a plea agreement with the Garfield County prosecutor where he would receive leniency in connection with his case in Garfield County where he had been charged as an accessory after the fact in the Crites' homicide.

 

¶57 Appellant's claim of error relies solely on evidence outside of the record and included in his Motion for New Trial on Newly Discovered Evidence and Request for Evidentiary Hearing and Motion to Supplement Direct Appeal Record and/or for an Evidentiary Hearing filed pursuant to Rules 3.11(A) and/or Rule 3.11(B)(3)(b)(i)), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2020). The documents filed in support of the request for evidentiary hearing are not considered, by reason of their filing with this Court, part of the trial record. Dewberry v. State, 1998 OK CR 10, ¶, 9, 954 P.2d 774, 776. We consider the ex parte material only for the limited purpose of determining if an evidentiary hearing is warranted. It is not until such time as an evidentiary hearing is ordered and held that the materials are considered on the merits. Under our court rules, supplementation of the record with extra record material is strictly limited and is not allowable at this juncture of the case. See Rule 3.11(A) and/or Rule 3.11(B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2020). See also Coddington v. State, 2011 OK CR 17, ¶ 20, 254 P.3d 684, 698.

¶58 "Due process requires the State to disclose exculpatory and impeachment evidence favorable to an accused." Jones v. State, 2006 OK CR 5, ¶ 51, 128 P.3d 521, 540 (citing Brady v. Maryland, 373 U.S. 83 (1963)). "To establish a Brady violation, a defendant must show that the prosecution suppressed evidence that was favorable to him or exculpatory, and that the evidence was material." Id. Such evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. 2006 OK CR 5, ¶ 51, 128 P.3d at 541 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

¶59 Appellant initially fails to show that the State suppressed information regarding any federal charges. The record shows the State provided the defense with an NCIC report on Williamson in February 2017, approximately three (3) months before trial. There is no indication the State was aware of any change in that report by the time of trial. Any federal charges filed after February 2017 were public record which defense counsel could have discovered with due diligence.

¶60 Further, Appellant has not shown the evidence was material as he has failed to show that had evidence of any federal charges against Williamson been presented to the jury, the result of his trial would have been different. The jury heard Williamson say that he was testifying against Appellant in exchange for leniency in his Garfield County case. Appellant offers no support for his argument that Williamson "continued to benefit", received, or expected to receive additional leniency in connection with any pending federal charges.

¶61 Even if there was support for Appellant's claim that Williamson was expecting leniency in the additional federal cases, it is not clear how that would have impacted Williamson's credibility with the jury. They knew he had pending criminal charges and had made a deal with the State in exchange for testimony. His testimony connecting Appellant to the murder weapon was corroborated by numerous witnesses and a photograph of Appellant with the gun. Williamson's testimony that he ultimately sold the gun was corroborated by the purchaser Oakley who turned the gun over to law enforcement. This trial testimony was consistent with Williamson's preliminary hearing testimony. Appellant offers no explanation as to how the absence of any information regarding any pending federal charges contributed to Williamson fabricating any of his testimony. There was no reasonable probability that Appellant would have been acquitted if the jury knew Williamson had additional pending federal charges. Appellant has failed to show any Brady violation. This proposition is denied. The motion to supplement as it pertains to the allegations raised in Proposition IV is denied.

¶62 In Proposition V, Appellant contends this Court's rules relating to supplementing the record on appeal do not provide a sufficient opportunity to raise Brady violations (such as that raised in Proposition IV) based on extra-record evidence. He argues that the lack of an adequate process on direct appeal for development and presentation of Brady violations violates the Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the Sixth Amendment.

¶63 Appellant has cited no authority, statute, court rule, or case law authorizing formal discovery during the direct appeal process in Oklahoma. In fact, the United States Supreme Court held "[t]here is no general constitutional right to discovery in a criminal case." Gray v. Netherland, 518 U.S. 152, 168 (1996) (quoting Weatherford v. Bursey, 429 U.S. 545, 559 (1977)).

¶64 In Oklahoma, the Record on Appeal is formulated only by matters that have been admitted during the proceedings in the trial court. Rule 3.11(B)(3), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2020). On direct appeal, a defendant may request an evidentiary hearing to develop extra-record evidence pursuant either to a motion for new trial or a motion for evidentiary hearing. See Rules 2.1(A), 3.11. Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2020). Evidentiary hearings under Rule 3.11(B)(3)(b) are limited to claims of ineffective assistance of counsel. See Grissom v. State, 2011 OK CR 3, ¶ 80, 253 P.3d 969, 995. If the case is remanded for an evidentiary hearing, the evidentiary record thus created in the district court may then be admitted as part of the record on appeal and considered in connection with Appellant's claims of ineffective counsel. Rule 3.11(B)(3) and (C). See also Grissom, 2011 OK CR 3, ¶ 80, 253 P.3d at 995.

¶65 Rule 3.11(A) permits this Court, on its own discretion, to direct supplementation of the record when necessary for a determination of any issue regarding matters previously submitted to the District Court. See Davis v. State, 2011 OK CR 29, ¶ 197, 268 P.3d 86, 132; Coddington, 2011 OK CR 17, ¶ 21, 254 P.3d at 698. The procedures set forth in our court rules provide defendants with a sufficient opportunity to supplement the record with extra-record evidence, once the material has been tested by the adversarial process. Appellant has not only failed to show that he has a due process right to discovery on appeal but he has also failed to show that the procedures used by this Court to supplement the record violate due process.

¶66 As for his claim of a compulsory process clause violation, Appellant provides no authority that the compulsory process clause of the Sixth Amendment applies on direct appeal. The Clause states that it applies to "criminal prosecutions" and every right listed within the Sixth Amendment pertains to trial.[6] Further, the Compulsory Process Clause only guarantees a defendant the right to call witnesses "in his favor." Melendez-Diaz v. Massachusetts, 557 U.S. 305, 313 (2009) (quoting U.S. Const.amend. VI). Further, the Supreme Court has never held the Compulsory Process Clause requires the production of evidence. See Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987).

¶67 In this case, Appellant seeks broad discovery of Ivan Williamson's criminal record as it pertains to records in Garfield and Pushmataha Counties in the State of Oklahoma, including but not limited to court records and files from the District Attorneys' office; Williamson's files from the Oklahoma Department of Corrections and the Federal Bureau of Prisons; and reports from the Federal Bureau of Investigation and the U.S. Marshall's Service. Appellant claims this is potential exculpatory evidence showing that Williamson continued to benefit from his testimony. Appellant's discovery request is made only for the purpose of uncovering evidence related to speculative allegations of government misconduct unsubstantiated by any evidence. Appellant has provided nothing to this Court to show that the volumes of files he wishes to comb through might yield evidence to support his theory. Appellant is simply on a "fishing expedition" to find any additional evidence that might be used to further impeach the credibility of Williamson. We find the procedures set forth in our court rules, together with the statutory provisions for a Motion for New Trial, 22 O.S.2011, § 952 et. seq., provide defendants a sufficient mechanism to develop extra-record evidence on direct appeal. The proposition is denied.

¶68 In Proposition VI, Appellant contends this Court's rules do not provide an adequate opportunity to raise ineffective assistance of counsel claims based on extra-record evidence. Appellant's argument is nearly identical to that raised in Proposition V and to that end he incorporates the argument and authority previously set forth relating to Rule 3.11.

¶69 As addressed above, Appellant has failed to show that this Court's procedures for raising claims on direct appeal based on extra-record materials violate the Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the Sixth Amendment. A defendant who seeks an evidentiary hearing must present evidence to support his claim but this evidence does not have to rise to the level of establishing a Sixth Amendment violation. As we stated in Grissom, 2011 OK CR 3, ¶ 81, 253 P.3d at 995 the clear and convincing standard of Rule 3.11(B)(3)(b) is a less demanding test than the test to determine ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). "[I]t is less of a burden to show, even by clear and convincing evidence, merely a strong possibility that counsel was ineffective than to show, by a preponderance of the evidence that counsel's performance actually was deficient and that but for the unprofessional errors, the result of the proceeding would have been different as is required by Strickland." Id. (quoting Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 906). If the clear and convincing standard is met, the case will be remanded to the trial court for an evidentiary hearing where the full adversarial process will be utilized. Id., 2011 OK CR 3, ¶ 80, 253 P.3d at 995. "The evidentiary record thus created by the fact-finder in the district court may then be admitted as part of the record on appeal and considered in connection with Appellant's claims of ineffective counsel." Id. (citing Rule 3.11(B)(3)(b)). Accordingly, we find our Court rules adequately permit the development of extra-record evidence to support claims of ineffective assistance of counsel. This proposition is denied.

FIRST STAGE JURY INSTRUCTIONS

¶70 In Proposition VII, Appellant contends the trial court erred in refusing his requested jury instruction on second degree murder. He argues that in refusing his requested instruction, the trial court violated his federal due process rights under Beck v. Alabama, 447 U.S. 625 (1980). We review the trial court's denial of the requested instruction for an abuse of discretion. Bench v. State, 2018 OK CR 31, ¶ 68, 431 P.3d 929, 953. Absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law. Id. 

¶71 "In Beck, the United States Supreme Court held that a sentence of death may not constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Bench, 2018 OK CR 31, ¶ 70, 431 P.3d at 954 (citing Beck, 447 U.S. at 637). "However, Beck does not require that the jury in a capital case be given a non-capital option where the evidence absolutely does not support that option." Id.

¶72 In Bench, we noted that "[a] Beck claim has two components. First, the appellant must establish that the crime on which the trial court refused to instruct was actually a lesser-included offense of the capital crime of which he was convicted. Second, the appellant must show that the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first degree murder." Id. 2018 OK CR 31, ¶ 71, 431 P.3d at 954. 

¶73 Turning first to state law to resolve Appellant's claim, as second degree murder has historically been recognized as a lesser included offense of first degree murder, we conclude that the requested lesser offense was, in fact, a necessarily included offense of the charged crime. Id. 2018 OK CR 31, ¶ 74, 431 P.3d at 954. Therefore, Appellant was entitled to an instruction on second degree depraved mind murder if prima facie evidence of the offense was presented at trial. Prima facie evidence of a lesser included offense is that evidence which would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater. Id.

¶74 Murder in the second degree occurs "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 21 O.S.2011, § 701.8(1)). Second degree depraved mind murder is applicable where there is no premeditated intent to kill any particular person. Harris v. State, 2004 OK CR 1, ¶ 50, 84 P.3d 731, 750; Williams v. State, 2001 OK CR 9, ¶ 23, 22 P.3d 702, 712.

¶75 Appellant relies on Bench to argue that because he fired into the victim's house, this was a "textbook case of second degree murder." (Appellant's brief, pg. 76). In Bench, we recognized several examples of second degree murder including "shooting into a crowd, where one does not intend to kill any particular person, but where the likelihood of death is probable". Id. 2018 OK CR 31, ¶ 76, 431 P.3d at 954-55.

¶76 Appellant did not merely shoot into a crowd. The evidence showed that he was recruited by fellow gang members to find Brittany Dillard and kill her. He drove from Enid to Oklahoma City where he met with Jordan and others to formulate a plan to achieve that end. Appellant and his accomplices went to Dillard's home. Appellant kicked in the front door with the intention of shooting to kill Dillard and anyone else inside that house. The decedent just so happened to be sitting on the couch near the front door. Appellant fired at least five (5) times from close range, striking the decedent three (3) times in the chest, shoulder and leg. Appellant's statements, made after the fact that he shot the decedent not twice but four (4) times because he moved, shows this was more than merely firing into a crowd. Far from showing second degree murder, Appellant's actions show his premeditated intent to kill anyone behind that front door. Premeditation sufficient to constitute first degree murder may be formed in an instant, or it may be formed instantaneously as the killing is being committed. Williams, 2001 OK CR 9, ¶ 25, 22 P.3d at 712. It may be inferred from the fact of the killing, unless circumstances raise a reasonable doubt whether such design existed. Id. 

¶77 A review of the record shows Appellant did not present any evidence, nor did the State's case provide any, that showed he engaged in imminently dangerous conduct in extreme disregard for human life without the intent of taking the decedent's life. The evidence clearly supports a finding that when Appellant fired at the decedent, he did so with the intent to kill. Therefore, we must conclude that the evidence would not have permitted a rational jury to find Appellant guilty of second degree depraved mind murder. Therefore, we find that the trial court properly refused Appellant's requested instruction.

¶78 At the same time, we conclude that the evidence would not have permitted a rational jury to acquit Appellant of the charged offense of first degree murder. The medical examiner's testimony, corroborated by photographs, showed the decedent was shot at close range, as he sat on his couch. Butler testified that Appellant admitted shooting the decedent and that Jordan had told him they were supposed to kill everyone in the house. No reasonable view of the evidence would permit a rational jury to acquit Appellant of first degree murder.

¶79 Since Appellant has not shown that the evidence presented at trial would permit a rational jury to find him guilty of second degree depraved mind murder and acquit him of first degree murder we find the trial court did not violate Appellant's federal due process rights under Beck. This proposition is denied.

¶80 In Proposition VIII, Appellant challenges other instructions omitted from the jury's consideration. Regarding Brian Butler's testimony, the defense requested the uniform instructions on informant testimony (Oklahoma Uniform Jury Instruction -- Criminal (OUJI-CR) 9-43)) and jailhouse informant testimony (OUJI-CR 9-43A). The trial court refused to give both instructions. We review the trial court's decision for an abuse of discretion under the standard set forth above.

¶81 Instruction No. 9-43 provides in pertinent part that the testimony of an informer who provides evidence against a defendant for immunity from punishment or personal advantage must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. Here, Butler qualified as an informer as he provided evidence against Appellant in exchange for leniency in pending criminal cases.

¶82 When an informant's testimony stands uncorroborated, the trial judge should submit a cautionary instruction to the jury regarding the testimony. However, where corroboration exists for the informant's testimony, and substantial evidence other than the informant's testimony places the defendant at the scene of the crime, the failure to give the cautionary instruction is not an abuse of discretion. See Short v. State, 1999 OK CR 15, ¶ 50, 980 P.2d 1081, 1099; Gilbert v. State, 1988 OK CR 289, ¶ 9, 766 P.2d 361, 363; Smith v. State, 1987 OK CR 94, ¶ 31, 737 P.2d 1206, 1213; Gee v. State, 1975 OK CR 133, ¶ 11, 538 P.2d 1102, 1106.

¶83 Here, Butler's testimony was corroborated by Appellant's cell phone records -- both the CSLI and records showing he cancelled his phone service shortly after the murder, and calls made and received from the Jordan/Pennon phone. Corroboration about the murder weapon came in part from Treylon Haley and Ivan Williamson. More than just Butler's testimony connected Appellant to the murder. Therefore, the trial court did not abuse its discretion in failing to give the cautionary instruction.

¶84 Instruction No. 9-43A "is to be given when a witness is a 'professional jailhouse informant.'" Andrew v. State, 2007 OK CR 23, ¶ 114, 164 P.3d 176, 200, (overruled on other grounds by Williamson v. State, 2018 OK CR 15, ¶ 51 n. 1, 422 P.3d 752, 762 n. 1). A "jailhouse informant" is typically a witness who was incarcerated with the defendant and claims to have incriminating information which he or she exchanges for a benefit. See Andrew, 2007 OK CR 23, ¶ 114, 164 P.3d at 200; Myers v. State, 2006 OK CR 12, ¶ 12, 133 P.3d 312, 321 (overruled on other grounds by Davis v. State, 2018 OK CR 7, ¶ 26 n.3, 419 P.3d 271, 281 n. 3); Dodd, 2000 OK CR 2, ¶¶ 14-26, 993 P.2d at 782-84.

¶85 Butler was not incarcerated with Appellant at the time Appellant confided in him. Butler's testimony was based upon his presence at the scene of the murder. Appellant has cited no authority that makes Instruction 9-43A applicable to this situation. The trial court did not abuse its discretion in refusing the requested instruction.

¶86 Even without these instructions on informant testimony, the jury was fully informed that it was their responsibility to determine the credibility of the witnesses, and in so doing, they should consider any interest, bias or prejudice the witness may have. Defense counsel capitalized on this instruction in closing argument, telling the jury that Butler benefitted the most of all the State's witnesses, in testifying against Appellant. The jury was fully informed of the applicable law and we find no abuse of the trial court's discretion in refusing the requested instructions.

¶87 Appellant next finds error in the trial court's failure to sua sponte instruct the jury that Butler, Williamson, Treylon Henry, Anthony Brown and Donta Young were accomplices whose testimony required corroboration. As Appellant concedes he did not request these instructions, our review is for plain error. Under the standard set forth in Simpson v. State, 1994 OK CR 40, 876 P.2d 690, we determine whether Appellant has shown an actual error, which is plain or obvious, and which affects his substantial rights. Duclos v. State, 2017 OK CR 8, ¶ 5, 400 P.3d 781, 783. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. Id.

¶88 To determine whether a witness is an accomplice, this Court must first decide whether the witness could be charged for the offense for which the accused is being tried. Mitchell v. State, 2018 OK CR 24, ¶ 16, 424 P.3d 677, 683; Spears v. State, 1995 OK CR 36, ¶ 27, 900 P.2d 431, 440. Whether a witness is an accomplice may be a matter of law for the trial judge, or the evidence may require the question to be submitted to the jury. Spears, 1995 OK CR 36, ¶ 27, 900 P.2d at 440. If a witness is found to be an accomplice, his/her testimony must be corroborated, for a conviction cannot be based upon the uncorroborated testimony of an accomplice. 22 O.S.2011, § 742 ("[a] conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.")

¶89 Appellant first argues that Butler could have been charged as an accessory with murder in the first degree for his presence at the homicide scene and for his failure to report the crime until it served his own purposes. Charging Butler as an accessory would not make him an accomplice to the first degree murder of the decedent. See 21 O.S.2011, § 173 (elements of the crime of Accessory). See also Edmondson v. State, 1975 OK CR 32, ¶ 18, 532 P.2d 81, 84 (testimony of an accessory need not be corroborated).

¶90 Further, Butler's mere presence at the scene does not necessarily make him an accomplice. "Where there is no evidence that a witness participated in, planned, or encouraged the commission of a crime, their mere presence during its commission will not make them an accomplice." Spears, 1995 OK CR 36, ¶ 28, 900 P.2d at 440. Here, Butler waited in Appellant's vehicle while Appellant and others went inside the Rhodes' residence. Another person had been ordered by Appellant to sit in the driver's seat, and this person ultimately drove the group away from the murder scene. There is no evidence that Butler helped plan the murder, participated in the shooting, aided Appellant in the shooting, or encouraged him to commit the crime. Nothing in the record indicates Butler was aware that the purpose of the trip to the Rhodes' residence was to kill those inside. Therefore, we find Butler was not an accomplice and the trial court properly omitted an instruction on accomplice testimony. See Carter v. State, 1994 OK CR 49, ¶ 29, 879 P.2d 1234, 1246. Finding no error, we find no plain error in the absence of the instruction.

¶91 As for Williamson, Haley, Brown, and Young, Appellant argues they were accomplices to the Crites homicide and the jury should have been instructed that their testimony required corroboration. The Crites homicide is not at issue before us. That evidence was admitted in the instant proceedings solely in support of the alleged aggravating circumstances. Appellant cites no authority for extending the corroboration requirement of accomplices to a crime for which the defendant is not on trial. Therefore, we find no error, and thus no plain error in omitting accomplice instructions regarding the Crites homicide. This proposition is denied.

SUFFICIENCY OF THE EVIDENCE OF FIRST DEGREE MURDER

¶92 In Proposition IX, Appellant challenges the sufficiency of the evidence supporting his conviction for first degree malice aforethought murder. We review Appellant's challenge to the sufficiency of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. Mitchell, 2018 OK CR 24, ¶ 11, 424 P.3d at 682. In reviewing sufficiency of the evidence claims, this Court does not reweigh conflicting evidence or second-guess the decision of the fact-finder; we accept all reasonable inferences and credibility choices that tend to support the verdict. Id. The credibility of witnesses and the weight and consideration to be given to their testimony are within the exclusive province of the trier of facts. Rutan v. State, 2009 OK CR 3, ¶ 49, 202 P.3d 839, 849.

¶93 Appellant essentially argues the evidence is insufficient to support a first degree murder conviction because Brian Butler did not witness the murder and no other evidence established that Appellant actually shot and killed the decedent.

¶94 While none of the testifying witnesses observed the actual murder, sufficient evidence was presented from which the jury could reasonably infer Appellant shot and killed the decedent. The State's evidence showed that before arriving at the murder scene, Appellant met with Howard, Jordan, and Pennon. Appellant then drove to the murder scene. He ensured there was a person sitting in the driver's seat of his vehicle when he exited it and walked up to the Rhodes' residence. Appellant kicked in the front door and fired into the house multiple times. As soon as the gunshots stopped, Appellant and Jordan ran to his car. Appellant got in and pulled Jordan in with him. She said they were supposed to have killed everyone in the house. Appellant admitted to Butler that he shot the decedent multiple times because he moved. It was later determined that the decedent's wounds were consistent with having been shot while moving from a sitting position.

¶95 Appellant had a .45 caliber Taurus with him when he got in the car after the murder. Butler and Williamson testified that Appellant routinely carried a .45 Taurus pistol. Photographs showed Appellant holding a .45 pistol. Shell casings for a .45 pistol were found at the murder scene. Testimony from Haley, Williamson, and Oakley led to the retrieval of the .45 used by Appellant. The shell casings found at the scene were determined to have been fired from the .45 caliber pistol used by Appellant.

¶96 Cell phone records placed Appellant's phone in the vicinity of the murder scene at the time of the murder. Actions by Appellant shortly after the murder such as changing his phone number and disposing of his .45 caliber Taurus are indicative of a consciousness of guilt.

¶97 Most of Appellant's argument in this proposition concerns the credibility of Butler. "[A] fundamental premise of our criminal trial system is that 'the jury is the lie detector.'" Martinez v. State, 1999 OK CR 33, ¶ 36, 984 P.2d 813, 824 (quoting United States v. Scheffer, 523 U.S. 303, 313 (1998)). "Determining the weight and credibility of witness testimony, therefore, has long been held to be the 'part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'" Id. Here, the jury was fully informed of Butler's criminal history as well as that of Williamson. The jury found their testimony in this case credible. We find no reason to second-guess the jury's judgment. Based upon the evidence, the jury could logically infer that Appellant maliciously shot and killed the decedent. The evidence was sufficient for any rational trier of fact to find Appellant guilty of first degree malice murder. This proposition is denied.

SECOND STAGE ISSUES

¶98 In Proposition X, Appellant contends the victim impact evidence was improper as it focused solely on the emotional and psychological impact of the decedent's murder. The record shows that a hearing pursuant to Cargle v. State, 1995 OK CR 77, 909 P.2d 806 was held prior to the admission of the victim impact evidence. The parties (judge, prosecutor, and defense counsel) went through the proposed victim impact statements in detail to determine what was admissible. In light of agreements reached and applying the applicable law, the parties agreed on several redactions. At the conclusion of the hearing, the defense did not raise the objection now raised on appeal. Therefore, our review is for plain error under the standard set forth above. Martinez v. State, 2016 OK CR 3, ¶ 64, 371 P.3d 1100, 1115 (citing Simpson, 1994 OK CR 40, ¶ 2, 876 P.2d at 692-93).

¶99 "Evidence about the victim, physical effects of the crime, the circumstances surrounding the crime and the manner in which it was perpetrated, and the financial, emotional, psychological, and physical impact of the murder on the victim's family is admissible in capital sentencing." Martinez, 2016 OK CR 3, ¶ 65, 371 P.3d at 1115 citing 21 O.S.2011, § 701.10.

¶100 Appellant now objects to specific portions of the testimony from the decedent's wife, daughter, mother, and sister as focusing solely on the emotional impact of their loss instead of giving a quick glimpse into the decedent's life. In Martinez and Cuesta-Rodriguez v. State, 2010 OK CR 23, ¶ 68, 241 P.3d 214, 236 we rejected similar claims that the victim impact testimony focused exclusively on the emotional and psychological impact of the murder and was therefore inadmissible. As in Martinez and Cuesta-Rodriguez, we find the victim impact testimony in this case was not overly focused on the emotional and psychological aspects but was narrowly tailored to the permissible topics. The testimony was not so overly emotional as to have a prejudicial effect nor did it so skew the presentation as to divert the jury from its duty to reach a reasoned moral decision on whether to impose the death penalty. See Warner v. State, 2006 OK CR 40, ¶ 152, 144 P.3d 838, 884 (overruled on other grounds, Taylor v. State, 2018 OK CR 6, 419 P.3d 265).

¶101 We also reject Appellant's broader claim that victim impact testimony is an impermissible super-aggravator. We have repeatedly rejected this claim and see no reason to revisit the issue here. Martinez, 2016 OK CR 3, ¶ 66, 371 P.3d at 1116; Warner, 2006 OK CR 40, ¶ 156, 144 P.3d at 885. Having thoroughly reviewed Appellant's challenge to the victim impact evidence, we find no error and thus no plain error in its admission.[7]

 

¶102 In Proposition XI, Appellant argues the use of unadjudicated offenses to support the continuing threat aggravator violates the Eighth Amendment to the United States Constitution. Appellant asserts that allowing the use of unadjudicated offenses violates the higher level of scrutiny guaranteed by the Eighth Amendment. The trial court overruled Appellant's pre-trial motion raising this objection. The objection was raised again, and denied again, at trial. The admission of evidence is left to the sound discretion of the trial court whose decision will not be disturbed absent an abuse of that discretion. Davis, 2011 OK CR 29, ¶ 156, 268 P.3d at 125.

 

¶103 This Court has repeatedly upheld the admission of unadjudicated offenses to support the continuing threat aggravator. Frederick v. State, 2017 OK CR 12, ¶ 117, 400 P.3d 786, 818 (overruled on other grounds, Williamson v. State, 2018 OK CR 15, 422 P.3d 752). "Evidence of a capital defendant's violent acts is relevant and admissible to show the existence of a probability the defendant poses a continuing threat, 'whether those acts resulted in a conviction of the actual offense, some related or lesser included offense, or no conviction at all.'" Id. (quoting Harmon v. State, 2011 OK CR 6, ¶ 62, 248 P.3d 918, 939-940. See also Warner, 2006 OK CR 40, ¶ 123, 144 P.3d at 879; Hain v. State, 1996 OK CR 26, ¶¶ 35-36, 919 P.2d 1130, 1141. Appellant's argument to revisit the issue is not persuasive. We find the trial court did not abuse its discretion in admitting the evidence. This proposition is denied.

CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

¶104 In Proposition XII, Appellant argues that if this Court declines to find the State committed a Brady violation in failing to disclose the circumstances surrounding Williamson's pending federal case and the Pushmataha County case, then counsel was ineffective for failing to discover and use the evidence to impeach Williamson.

¶105 This Court reviews ineffective assistance of counsel claims under the two-part test mandated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687 (1984). Frederick, 2017 OK CR 12, ¶ 158, 400 P.3d at 825. "The Strickland test requires an appellant to show: (1) that counsel's performance was constitutionally deficient; and (2) that counsel's deficient performance prejudiced the defense." Id. "Unless the appellant makes both showings, 'it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.'" Id. "Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy." Id. 2017 OK CR 12, ¶ 159, 400 P.3d at 825-26.

¶106 Appellant's claim depends almost entirely on material attached to his motion to supplement/motion for evidentiary hearing. These attachments filed in support of a request for an evidentiary hearing are not considered, by reason of their filing with this Court, part of the trial record. Bland v. State, 2000 OK CR 11, ¶ 115, 4 P.3d 702, 731; Dewberry v. State, 1998 OK CR 10, ¶ 9, 954 P.2d 774, 776. If the material is not within the existing record, then only if it is properly introduced at an evidentiary hearing will it be a part of the trial court record on appeal. Id. The attachments will be considered only in regards to the application for evidentiary hearing on sixth amendment claims.

¶107 As stated earlier in this opinion, Rule 3.11(B)(3)(b) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to utilize available evidence which could have been made available during the course of trial. Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence. Id. If the Court determines from the application that a strong possibility of ineffectiveness is shown, we will "remand the matter to the trial court for an evidentiary hearing, utilizing the adversarial process, and direct the trial court to make findings of fact and conclusions of law solely on the issues and evidence raised in the application." Rule 3.11(B)(3)(b)(ii). See also Grissom, 2011 OK CR 3, ¶ 80, 253 P.3d at 995; Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 906.

¶108 The attachments to Appellant's motion show state and federal cases against Willliamson. These attachments include a Second Amended Judgment and Sentence for the crime of Accessory After the Fact, Garfield County, Oklahoma, Case No. CF-2013-39 (Attachment A); a July 22, 2014 court minute from Garfield County, Case No. 2013-39 (Attachment B); a Felony Information alleging three (3) drug offenses, Case No. CF-2017-83, Pushmataha County, Oklahoma (Attachment C); a Motion and Order of Dismissal, Case No. CF-2017-83, Pushmataha County (Attachment D); a Docket Sheet for the Eastern District of Oklahoma, Case No. C: 17-CF-00022JHP-1, showing a pending charge for Felon in Possession of a Firearm (Attachment E); a News release of the United States Attorney's Office, Eastern District of Oklahoma, regarding Williamson's guilty plea to the crime of Felon in Possession of a Firearm (Attachment F); a Federal Board of Prisons Person Sheet on Williamson (Attachment G); an Oklahoma Department of Correction Offender Information on Williamson (Attachment H); an Application to Revoke, Garfield County Case No. CF-2013-39 (Attachment I); and an Order Revoking Suspended Sentence, Case No. CF-2013-39 (Attachment J).

¶109 Also included are signed affidavits from appellate and trial counsel. Included as Attachment K is a signed affidavit from appellate counsel stating in part that she discovered Williamson's federal case by doing a search on the internet. She states that after reviewing trial counsel's file, she found nothing indicating the defense had been notified of the federal charges, and interviews with trial counsel confirmed that they had not been notified of the federal charges. Counsel states that in anticipation of presenting a Brady claim or ineffective assistance of counsel claim on appeal, she has pursued various avenues of investigation but has been unable to generate any additional information about the federal case and whether state and federal entities were in communication about the cases.

¶110 In Attachment L, trial counsel states in part that at the time of Appellant's trial, she did not know about Williamson's federal case, and was never provided any discovery from the State regarding the evidence. Counsel states that had she known Williamson had pled guilty to a federal charge of gun possession, she would have cross-examined him on his motivation to testify against Appellant and any expectation he had in regard to his testimony.

¶111 While the above listed attachments clearly show Williamson had a criminal history, and according to trial counsel she did not know about any pending federal charges, Appellant has failed to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize the evidence. In order to meet the clear and convincing standard, Appellant must present this Court with evidence, not speculation, second guesses, or innuendo. Frederick, 2017 OK CR 12, ¶ 166, 400 P.3d at 827. Nothing in these attachments show that Williamson received any benefit in his pending state or federal cases, outside of the Garfield County case, for his testimony against Appellant.

¶112 In fact, attachments to the State's brief, filed in response to the 3.11 motion, show no consideration was given to Williamson in his pending cases for his testimony against Appellant. See Exhibit C (signed affidavit of the prosecutor stating in part that Williamson testified for the State against Appellant pursuant to a plea agreement with respect to charges filed in Garfield County; that she had no knowledge at the time of Appellant's trial that Williamson had any federal charges; that she did not recall any discussions with the U.S. Attorneys Office or Federal Public Defender regarding Williamson's testimony against Appellant; and Williamson did not have an agreement, tacit or otherwise with the Oklahoma County District Attorney's Office to assist in any manner with his federal charges or charges from Pushmataha County); Exhibit D (signed affidavit of Assistant U. S. Attorney for Eastern District of Oklahoma stating in part that Williamson did not receive any consideration in his federal case for his testimony against Appellant and that Williamson was not working as an informant for federal law enforcement).

¶113 See also Exhibit E (signed affidavit of Federal Public Defender for Eastern District of Oklahoma stating in part that he was aware Williamson was a witness in Appellant's case but counsel never spoke with any member of the District Attorney's Offices from Oklahoma or Garfield Counties regarding Williamson's federal charges and to the best of his knowledge Williamson did not receive any consideration in his federal case for his testimony against Appellant); and Exhibit F (signed affidavit from Assistant District Attorney in Pushmataha County stating in part that charges against Williamson filed in Pushmataha County were dismissed in September 2017 (3 months after Appellant's trial) based solely on Williamson's pending federal case; counsel was unaware of Appellant's case and unaware that Williamson had testified in Appellant's case; and Williamson's cooperation in Appellant's case played no role in the decision regarding the disposition of the Pushmataha County case).[8]

 

¶114 Here, the jury heard Williamson testify that his testimony against Appellant was given in exchange for leniency in the Garfield County case. Appellant has not shown that Williamson's credibility with the jury would have been impacted had counsel cross-examined him on the existence of any pending federal or state charges, nor has he shown that the outcome of the trial would have been different had the jury known he had any pending charges in addition to the charge from Garfield County. Further, Williamson was not the only witness to tie Appellant to the murder weapon. Appellant was tied to the murder weapon by several witnesses.

 

¶115 Having thoroughly reviewed Appellant's Notice of Extra-Record Evidence and Rule 3.11 Motion to Supplement Direct Appeal Record and Request for an Evidentiary Hearing, and accompanying affidavits, we find he has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to investigate further and utilize the complained-of evidence. We decline to grant Appellant's request for an evidentiary hearing on Sixth Amendment grounds. We also deny his motion to supplement the record.

¶116 Regarding the claim of ineffectiveness raised in the appellate brief concerning counsel's failure to investigate and present evidence of Williamson's pending cases, we find Appellant has not shown trial counsel to be ineffective under the more rigorous federal standard set forth in Strickland for ineffective assistance of counsel. See Grissom, 2011 OK CR 3, ¶ 81, 253 P.3d at 995 (citing Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905-906. Therefore, his claim of ineffective assistance of counsel is denied.

¶117 Additionally, Appellant has filed a Motion for New Trial on Newly Discovered Evidence and Request to Remand the Case for an Evidentiary Hearing and Brief in Support. Appellant's motion is based on the same evidence included in the request for an evidentiary hearing on Sixth Amendment grounds. Rule 2.1(A), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2020), provides that a motion for new trial on newly discovered evidence may be filed with this Court and is governed by the provisions of 22 O.S.2011, §§ 952 and 953. Under these provisions a motion for new trial based on newly discovered evidence may be made within three (3) months after such evidence is discovered "but no such motion may be filed more than one (1) year after judgment is rendered." 21 O.S.2011, § 953. The Judgment and Sentence in this case was imposed on July 24, 2017. The motion for new trial was filed November 2, 2018. Accordingly, Appellant's Motion for New Trial is not timely filed and is hereby denied. See Owens v. State, 1985 OK CR 114, ¶ 17, 706 P.2d 912, 913 (motion for new trial denied as not timely filed).

SECOND STAGE JURY INSTRUCTIONS

¶118 In Proposition XIII, Appellant challenges various sentencing stage jury instructions and victim impact evidence. He acknowledges this Court has previously denied these challenges, but requests we reconsider our rulings. We review Appellant's claims for plain error as the current objections were not raised at trial. See Harmon, 2011 OK CR 6, ¶ 85, 248 P.3d at 944-45; Simpson, 1994 OK CR 40, ¶ 2, 876 P.2d at 693.

¶119 Appellant first complains that instructing the jury pursuant to uniform instruction No. 4-78 in the permissive language that mitigating circumstances are those which "may be considered" as extenuating or reducing the degree of blame instead of using the mandatory language of "must be considered" allowed the jury to disregard mitigating evidence. This argument was previously rejected in Harmon, 2011 OK CR 6, ¶ 85, 248 P.3d at 945. There, we noted that in reading the second stage instructions as a whole and in their entirety, the jury was not allowed to disregard the mitigating evidence presented.

¶120 In Appellant's case, in addition to the above instruction, the jury was also instructed that the law sets forth "certain minimum mitigating circumstances you shall follow as guidelines in determining which sentence to impose." The jury was further informed that "you shall consider any or all of the minimum mitigating circumstances which you find apply to the facts and circumstances of this case." The jury was also instructed that they need not limit their consideration to the specifically listed mitigating factors and may consider additional mitigating evidence and the specific mitigating factors listed. Reading the second stage instructions as a whole, it is clear that the jury was not told to disregard any mitigating evidence. We find no error, and thus no plain error in giving the instruction on mitigating evidence.

¶121 Appellant next argues that Instruction No. 48, taken verbatim from OUJI-CR 2d 4-76, erroneously implies that a life sentence is appropriate only if the jury failed to find the existence of an aggravating circumstance. This claim was previously rejected in Harmon, 2011 OK CR 6, ¶ 86, 248 P.3d at 945. Appellant has not persuaded us to reconsider our decision.

¶122 Appellant next asserts that OUJI-CR 2d 4-80, given to the jury as Instruction No. 53, improperly permitted the jury to weigh the totality of the aggravating circumstances against each individual mitigating circumstance, rather than weighing the aggregate mitigating factors found against each separate aggravating circumstance as required by 22 O.S.2011, § 701.11.

¶123 This argument has been rejected in Underwood v. State, 2011 OK CR 12, ¶ 61-62, 252 P.3d 221, 246; Mitchell v. State, 1994 OK CR 70, ¶¶ 61-63, 884 P.3d 1186, 1207. In Mitchell, this Court said the standard uniform instruction made clear the requirement that the aggravating circumstances must outweigh the mitigators unanimously. This Court found the uniform instruction was not contrary to Section 701.11 nor did it skew the burden of proof. Id. 1994 OK CR 70, ¶ 61, 884 P.3d at 1207. The instruction given to Appellant's jury uses the same language as Section 701.11.

¶124 Appellant's reference to Hurst v. Florida, 136 S.Ct. 616 (2016) does not convince us to reconsider our position. Rejecting this same argument in Underwood v. Royal, 894 F.3d 1154 (2018) the Tenth Circuit Court of Appeals noted that Hurst "invalidated Florida's [death penalty] scheme specifically 'to the extent [it] allow[s] a sentencing judge to find an aggravating circumstance that is necessary for imposition of the death penalty." 894 F.3d at 1186 (emphasis in original). That is not the situation under Oklahoma law or in Appellant's case. Accordingly, we find no error and thus no plain error in the instruction.

¶125 Lastly, Appellant argues the victim impact evidence operates as an unconstitutional "super-aggravator." This Court has repeatedly rejected this argument. See Malone v. State, 2007 OK CR 34, ¶ 46, 168 P.3d 185, 204; DeRosa v. State, 2004 OK CR 19, ¶ 83, 89 P.3d 1124, 1152--53; Hooks v. State, 2001 OK CR 1, ¶ 38, 19 P.3d at 313--314; Cargle, 1995 OK CR 77, ¶ 75, n. 15, 909 P.2d at 828 n. 15. As we stated in Malone, "[w]e rely upon the Supreme Court's decision in Payne v. Tennessee [501 U.S. 808 (1991)][9] along with the precedents of this Court following Payne, all of which recognize the limited but appropriate role of victim impact evidence within the second stage of a capital trial." 2007 OK CR 34, ¶ 46, 168 P.3d at 204. We find no reason to revisit the issue.

ACCUMULATION OF ERROR CLAIM

¶126 In Proposition XIV, Appellant asserts that cumulative error warrants a new trial or a modification of his sentence. A cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. Frederick, 2017 OK CR 12, ¶ 202, 400 P.3d at 832-33. Having found no errors warranting reversal or modification, we find relief is not warranted upon a cumulative error argument. Lott v. State, 2004 OK CR 27, ¶ 167, 98 P.3d 318, 357. This proposition of error is denied.

MANDATORY SENTENCE REVIEW

¶127 In his Proposition XV, Appellant contends his sentence should be modified under our mandatory sentence review. He argues his death sentence was rendered arbitrarily as a result of passion and prejudice caused by all of the alleged errors. Appellant further argues his execution would violate the Eighth Amendment prohibition against cruel and unusual punishment.

¶128 Pursuant to 21 O.S.2011, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.2011, § 701.12. Turning to the second portion of this mandate, the jury found the existence of two aggravating circumstances: 1) the defendant knowingly created a great risk of death to more than one person; and 2) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.2011, § 701.12(2)(7).

¶129 Although Appellant has not challenged the sufficiency of the evidence supporting the aggravators, we will review the record to determine whether the evidence, considered in the light most favorable to the State, was sufficient for a rational trier of fact to find the aggravating circumstance beyond a reasonable doubt. Postelle v State, 2011 OK CR 30, ¶ 78, 267 P.3d 114, 143.

¶130 The "great risk of death to more than one person" aggravating circumstance is proved by a defendant's acts which create a risk of death to another "in close proximity, in terms of time, location, and intent" to the killing. Ryder v. State, 2004 OK CR 2, ¶ 77, 83 P.3d 856, 874. "The gravamen of the circumstance is not the number of persons killed, but the callous creation of the risk to more than one person." Id. See also Eizember v. State, 2007 OK CR 29, ¶ 123, 164 P.3d 208, 239.

¶131 Appellant went to the Rhodes' residence to kill everyone in the house. He walked past a baby stroller parked on the front porch, kicked open the front door, and started firing. He hit and killed the decedent. Sitting next to the decedent was his three (3) year old daughter. She was not struck with bullets, but was sprayed with her father's blood. Upstairs was the decedent's 19 year old son. He had been downstairs only moments before the shooting started. This evidence is more than sufficient to show Appellant created a great risk of death to more than one person.

¶132 To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future. Davis, 2011 OK CR 29, ¶ 136, 268 P.3d at 122. To prove this aggravating circumstance, the State may present any relevant evidence, in conformance with the rules of evidence, including evidence from the crime itself, evidence of other crimes, admissions by the defendant of unadjudicated offenses or any other relevant evidence. Id.

¶133 A finding that the defendant would commit criminal acts of violence that would constitute a continuing threat to society is appropriate when the evidence establishes the defendant participated in other unrelated criminal acts and the nature of the crime exhibited the calloused nature of the defendant. Id. The continuing threat aggravator is aimed at the defendant's future conduct. Ryder, 2004 OK CR 2, ¶ 66, 83 P.3d at 871. To establish continuing threat, the State must show a pattern of criminal conduct that will likely continue in the future. Id. 

¶134 The State's evidence showed that in 2009, 18 year old Michael Wedel and his sister were walking home from Saturday school when Appellant and others assaulted them. Wedel was knocked to the ground and punched several times by Appellant. Appellant kneed Wedel's sister in the stomach, and another person in Appellant's group ultimately stole her phone.

¶135 Shyon Russell testified that in September 2012 (approximately one month before the decedent's murder) she and a friend were leaving a club when a vehicle followed them. Gunshots were fired from the vehicle, striking Russell in the back. Casings recovered from that shooting matched Appellant's .45 Taurus.

¶136 In December 2012, shortly after the decedent's murder, Appellant shot and killed Heath Crites in Enid, Oklahoma. Testimony showed that Appellant orchestrated a plan where he, Treylon Haley, and others intended to rob Marciano Delacruz of his drugs. The group went to the trailer where they thought Delacruz lived. Appellant burst through the front door and fired multiple times. Crites, not Delacruz, lived in the trailer. Crites was struck at least eleven (11) times and died at the scene. Appellant explained the shooting as "no face no case." Appellant was convicted of Crites' murder and sentenced to life in prison without the possibility of parole.

¶137 The State also presented evidence of multiple traffic citations Appellant received in 2012 and an incident where the vehicle Appellant was driving flipped over with Haley and two (2) children inside. Further, the State presented evidence of least five (5) violent assaults committed by Appellant upon correctional officers and other inmates while incarcerated. The assaults began in October 2013 with the last one occurring in April 2017, less than one month before his murder trial.

¶138 The State's evidence showed a history of criminal conduct and a pattern of escalating violence. This evidence, combined with the evidence of Appellant's murder of the decedent, overwhelmingly supports the aggravator as establishing the existence of a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. See Davis, 2011 OK CR 29, ¶ 139, 268 P.3d at 122-23.

¶139 Evidence offered in mitigation showed that Appellant's parents divorced when he was young. He primarily lived with his mother but she worked long hours and was often gone from the home. She was the disciplinarian of the two parents, often using force. Whenever Appellant got into trouble with his mother, he would go to his father's house where the discipline was not so strict. Appellant's twin brother was a "straight A" student, athlete, and ultimately a college graduate. Appellant's grades were not as good as his brother's and he was described as "slow" and easily influenced. He acted out to gain attention.

¶140 Appellant was tested six (6) times between 2004-2015 and received scores of 81, 67 (estimate), 59, 80, 69, and 75.[10] Psychologist Dr. Terese Hall found these scores qualified Appellant as "mildly mentally retarded." However, she also testified that he suffered from "oppositional defiance disorder" as he did not apply his full efforts to the testing. Appellant sold drugs and left school after the 9th grade. He was in the custody of the Office of Juvenile Affairs by the time he was fifteen (15) years old. He scored below his grade level, but refused to go to class or attend counseling. He was described as not as mature as his contemporaries. Upon aging out of the juvenile system, Appellant was unable to live on his own and pay his own bills. Appellant's mother, sister, and brother asked for his life to be spared. This evidence was summarized and presented to the jury in Instruction No. 52, along with any other mitigating evidence the jury might find existed.

¶141 In rebuttal, the State presented testimony from forensic psychologist Dr. Shawn Roberson. He stated that in reviewing Appellant's records, his scores on IQ tests and academic achievement tests indicated he was not mentally retarded and did not have a learning disability. He said that Appellant's academic achievement scores were actually higher than his IQ scores, which is the opposite of what is usually seen in cases of mental retardation. He testified that typically a person gains their full level of intelligence at age fifteen or sixteen and that an individual cannot "fake" a higher IQ. He explained, "you would not expect somebody to answer questions they really don't know the answer to on an IQ test. You can't fake that way."

¶142 Dr. Roberson testified that once Appellant was charged with the decedent's murder (in January 2013), his attorneys had him tested frequently. He said that the June 2014 test given by Dr. Hall, resulting in a score of 59, was accompanied by notations that Appellant did not seem to be giving his full effort and that the score was very different from what he had previously obtained. According to Dr. Roberson, Dr. Hall concluded that Appellant did not meet the criteria for being mentally retarded. Dr. Roberson acknowledged that Dr. Hall subsequently changed her opinion.

¶143 Dr. Roberson also testified that giving Appellant three IQ tests within the span of five months during 2014 was unprofessional and unfair to Appellant as it could falsely elevate his IQ score and could make him eligible for the death penalty. Dr. Roberson said that he saw Appellant in the county jail in 2015 to administer an IQ test. He said that Appellant was cooperative, appeared to give his full effort, and did not appear to be malingering. Appellant's overall score on that test was 75. At that time, Appellant told Roberson that it was his understanding that he would be ineligible for execution if his IQ was below 75. Dr. Roberson also testified that the State had presented evidence at trial that ten days after Appellant's arrest, he had asked his sister to look up the elements of first degree murder needed for a conviction. Dr. Roberson said that it was very unusual and extremely rare for an individual with an intellectual disability to have such concerns. Dr. Roberson concluded that in his opinion, Appellant did not meet the diagnostic or statutory criteria for mental retardation.

¶144 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2011, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, this appeal is denied.

DECISION

¶145 The JUDGMENTS and SENTENCES are AFFIRMED. The motions to Supplement the Record, Remand for Evidentiary hearing on Sixth Amendment grounds, and for New Trial are DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE RAY C. ELLIOTT, DISTRICT JUDGE

 
 
 
 APPEARANCES AT TRIAL

 CATHERINE C. HAMMARSTEN
 JAMES T. ROWAN
 ASST. PUBLIC DEFENDERS
 OKLAHOMA CO. PUBLIC DEFENDER'S OFFICE
 320 ROBERT S. KERR, STE. 611
 OKLAHOMA CITY, OK 73102

 NICHOLE BURNS
 PRO HAC VICE

 COUNSEL FOR APPELLANT

 DAVID W. PRATER
 DISTRICT ATTORNEY
 SCOTT ROWLAND
 SUZANNE LAVENUE
 ASST. DISTRICT ATTORNEYS
 320 ROBERT S. KERR, STE. 505
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR THE STATE
 
 
 APPEARANCES ON APPEAL

 ANDREA DIGILIO MILLER
 ASSISTANT PUBLIC DEFENDER
 OKLAHOMA CO. PUBLIC DEFENDER'S OFFICE
 320 ROBERT S. KERR, STE. 611
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR APPELLANT

 MIKE HUNTER
 ATTORNEY GENERAL OF OKLAHOMA
 JENNIFER L. CRABB
 ASST. ATTORNEY GENERAL
 313 N.E. 21st ST.
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR THE STATE
 
 
 

 

OPINION BY: LUMPKIN, J.
LEWIS, P.J.: Concur in Results
KUEHN, V.P.J.: Concur in Part Dissent in Part
HUDSON, J.: Concur
DARBY, J.: [11] Concur

FOOTNOTES

[1] Appellant's Petition in Error was filed in this Court on January 23, 2018. His brief was filed November 2, 2018. The State's brief was filed on March 4, 2019. Appellant's reply brief was filed April 1, 2019. The case was submitted to the Court on March 11, 2019. Oral arguments were held on September 18, 2019.

[2] We recognize the United States Supreme Court and the Oklahoma Legislature have recently used the term "intellectual disability" instead of "mental retardation" when describing the limitations on a defendant's mental abilities. See Florida v. Hall, 572 U.S. 701, 704 (2014); 21 O.S.Supp.2019, § 701.10b. However, the term "mental retardation" will be used in this opinion in reference to the challenges to Appellant's mental abilities. "Mental retardation" is the term used in our prior case law developing this area of jurisprudence. "Mental retardation" is the result of a birth defect, a condition "that appears at birth or during the person's childhood. Mental retardation is not an after-acquired disability that arises from a person's lifestyle choices, but one that originates from birth." Murphy v. State, 2003 OK CR 6, ¶ 24, 66 P.3d 456, 460. The fact that it is a birth defect is the reason the IQ must be established before age 18. Use of the term "intellectual disability" tends to negate the conclusion that the condition is the result of a birth defect and likens it to later developing mental impairments caused by lifestyle choices or disease.

[3] Appellant argued before the trial court and now on appeal that his IQ scores must be adjusted not only for the standard error of measurement but also include a downward adjustment for the so-called Flynn Effect. In Smith v. State, 2010 OK CR 24, ¶ 10, n. 6, 245 P.3d 1233, 1237, n. 6 this Court stated "[t]he Flynn Effect is a theory based on the premise that results on any given I.Q. test will rise approximately 3 points for every 10 years that the test is in existence. The Flynn Effect has not achieved universal acceptance in courts where it has been raised. In this instance, however, unlike other jurisdictions that have considered the Flynn Effect, the Oklahoma Legislature has directed that only the standard error of measurement be included in the consideration of a defendant's I.Q. scores when making a mental retardation determination. Thus, it seems that under the Oklahoma statutory scheme, the Flynn Effect, whatever its validity, is not a relevant consideration in the mental retardation determination for capital defendants." (citations omitted). While Appellant relies on the Flynn Effect in evaluating his IQ scores, he has not challenged this Court's rejection of the principle.

[4] The Supreme Court remanded the case to the Texas Court of Criminal Appeals for further proceedings not inconsistent with its opinion. 137 S.Ct. at 1053. On remand the lower court reached the same conclusion it had previously, that Moore had not demonstrated intellectual disability. Ex parte Moore II, 548 S.W.3d 552, 555 (2018). In the appeal of that finding, the Supreme Court reversed the lower court again and remanded for further proceedings not inconsistent with its opinion. 139 S.Ct. 666, 672 (2019). The Supreme Court found that the lower court's determination was inconsistent with its opinion as it repeated the analysis previously rejected. Id. at 670.

[5] In his argument, Appellant also references charges against Williamson pending at the time of Appellant's trial in Pushmataha County. However, Appellant states in his brief that trial counsel was aware of the filing of the Pushmataha County charges before Appellant's trial. Therefore, the Pushmataha County charges are not addressed in this proposition.

[6] However, the Sixth Amendment right to counsel has been extended to direct appeal through the Fourteenth Amendment. Evitts v. Lucy, 469 U.S. 387, 392 (1985).

[7] I continue to believe that due to the unqualified overruling of Booth v. Maryland, 482 U.S. 496 (1987) and South Carolina v. Gathers, 490 U.S. 805 (1989) as being wrongly decided by the U.S. Supreme Court in Payne v. Tennessee, 501 U.S. 808 (1991), that at this time we have no guidance, except Payne as to the use of victim impact statements. See Bosse v. State, 2017 OK CR 10, 400 P.3d 835 (Lumpkin, P.J., concur in part/dissent in part). 

[8] Rule 3.11 does not require or disallow a response from the State regarding a defendant's request for an evidentiary hearing. As with the 3.11 Application, this material in response is considered only in determining if an evidentiary hearing should be ordered.

[9] Overruling Booth v. Maryland, 482 U.S. 496 (1987) and South Carolina v. Gathers, 490 U.S. 805 (1989).

[10] The dates and results of Appellant's IQ tests are as follows: November 2004 (Appellant was twelve (12) years old) and scored 81; 2008 test resulting in an estimated score of 67; March 2014 test resulting in a score of 59; June 2014 test with a score of 80; August 2014 test with a score of 69 and a June 2015 test resulting in a score of 75. As this record shows, the 81 score was the only score from a full scale IQ test before age 18 -- the necessary requisite to meet the definition of mental retardation.

[11] The Honorable Richard Darby, Justice of the Oklahoma Supreme Court, sitting by assignment.

 

 

LEWIS, PRESIDING JUDGE, CONCURRING IN RESULT:

¶1 Based on evidence of just one qualified intelligent quotient (IQ) score of 76 or more, 21 O.S.2011, section 701.10b(C) purports to eject a capital defendant from "any proceedings" under that section to establish intellectual disability as an exemption from capital punishment. Section 701.10b(C)'s IQ cut-off rule thus treats a qualified IQ score "as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence," while "refusing to recognize that the score is, on its own terms, imprecise." Hall v. Florida, 572 U.S. 701, 712 (2014). Applied in this way, Oklahoma's IQ cut-off rule could conceivably lead to results that violate the Eighth and Fourteenth Amendments as interpreted in Atkins v. Virginia, 536 U.S. 304 (2002), Hall, supra, and Brumfield v. Cain, 135 S.Ct. 2269 (2015).[1]

 

¶2 Trial courts should therefore use great caution in applying this statute. Even with proof of a reliable IQ score of 70 or less, Oklahoma requires a capital defendant claiming intellectual disability to prove, by clear and convincing evidence, both significant deficits in adaptive functioning and the onset of disability before the age of 18. 21 O.S.2011, § 701.10b(C).[2] If the State's retributive and deterrent interests in the death penalty legitimately can demand clear and convincing proof of an Atkins-based exemption,[3] the capital defendant's weighty Eighth Amendment interest in avoiding cruel and unusual punishment sensibly calls for proof of a qualified, cut-off level IQ score by equally clear and convincing evidence.

 

¶3 The State, not the defendant, should bear the burden of proof upon any motion or proceedings seeking application of the IQ cut-off rule. A trial court confronted with a request to invoke the IQ cut-off rule should conduct an evidentiary hearing and afford the parties a full opportunity to offer evidence on whether the alleged cut-off level IQ score(s) satisfies the requirements of section 701.10b(C). The trial court must also be mindful that some cut-off level IQ scores (of about 76-80) will include standard errors of measurement (SEM's) that express a true range of general intellectual functioning consistent with intellectual disability, if significant deficits in adaptive functioning are also present before age 18.[4]

 

¶4 Therefore, if a cut-off level IQ score (considering its standard error of measurement at the 95% confidence interval) expresses a range of intellectual functioning that coincides with the range of intellectual functioning expressed by an IQ score of 70 (about 65 to 75), the trial court should receive and consider evidence of other scores as well as evidence of adaptive functioning deficits before age 18, and determine whether the defendant is, more likely than not, intellectually disabled.[5] In such cases, the State's request to qualify the defendant for capital punishment based solely on one or more cut-off level IQ score(s) should be denied.

 

¶5 In this way, a trial court can probably avoid the kind of constitutional errors identified by the Supreme Court in Hall and Brumfield. The Supreme Court in Hall said that in using IQ as a measure of the defendant's eligibility for the death penalty

a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number. A State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability . . . [W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.

Hall, 572 U.S. at 723 (emphasis added).

¶6 The Eighth Amendment prohibits the execution of any intellectually disabled person, even one who may have IQ scores of 76 or more. "Intellectual disability is a condition, not a number," Hall, id. (emphasis added); and it is constitutionally unsound "to view a single factor [IQ] as dispositive" in the "conjunctive and interrelated assessment" of intellectual disability. Id. We must never debase our role in reviewing Atkins claims to the folly of a numbers game which recklessly "creates an unacceptable risk that persons with intellectual disability will be executed." Hall, 572 U.S. at 704.

¶7 I concur in the result here because the State established clear and convincing evidence that Appellant had a qualified cut-off level IQ score of 81, and the remaining record strongly indicates that Appellant was not intellectually disabled. Any minor deviations in this case from the constitutional norms established in Atkins and Hall were harmless beyond a reasonable doubt.

FOOTNOTES

[1] In Brumfield, the Supreme Court held the trial court's conclusion that an IQ score of 75 "necessarily precluded" any possibility that the petitioner possessed sub-average intelligence was unreasonable, because "[a]ccounting for [the] margin of error, Brumfield's reported IQ test result of 75 was squarely in the range of potential intellectual disability." Id., 135 S.Ct. at 2277-78.

[2] 21 O.S.2011, § 701.10b(A)(1, 3).

[3] The statute's burden of proof on the capital defendant to prove intellectual disability by clear and convincing evidence at the pre-trial hearing stage almost surely contravenes Eighth and Fourteenth Amendment standards of reliability and denies due process of law. See Cooper v. Oklahoma, 517 U.S. 348, 369 (1996) (holding statute which presumed defendant was competent to stand trial and must prove incompetence by clear and convincing evidence created unconstitutional risk that defendant would be put to trial even if he was, more likely than not, incompetent). The statute seems to indirectly acknowledge the constraints of Cooper at trial, requiring the defendant to persuade a lay jury of intellectual disability only by a preponderance of the evidence. Nevertheless, the law authorizes the capital jury trial of a defendant who could be, in the sincere view of the trial court, more likely than not intellectually disabled under prevailing medico-legal standards.

[4] For example, a typical IQ score of 78 would commonly express a true range of functioning from about 73 to 83. The 73 itself would also be well within the true range of functioning for a valid IQ of 70. See also Hall, 572 U.S. at 722 (citing Atkins, 536 U.S. at 304, n. 5) (noting that IQ test score between 70 and 75 or lower may establish intellectual disability, when concomitant significant deficits in adaptive functioning are present before age 18)).

[5] See Moore v. Texas, 137 S.Ct. 1039, 1049 (2017) (finding court should have moved on to consider additional evidence of adaptive functioning deficits and age of onset, where IQ of 74 yielded a range of 69 to 79, and lower end of that range is at or below 70).

 

 

KUEHN, V.P.J., CONCURRING IN PART/DISSENTING IN PART:

¶1 I concur in affirming the Judgment and Sentence in this case, but write separately to address several issues.

¶2 With regard to Proposition I, although the statutory procedure outlined in 21 O.S.Supp.2019, § 701.10b concerns an "evidentiary hearing to determine whether the defendant is intellectually disabled," this specific reference to a formal Atkins hearing does not preclude a "pre-Atkins" evidentiary hearing. The statutory procedure prevents a defendant from having an Atkins hearing if the defendant has an IQ score of 76 or above. However, the second paragraph of § 701.10b(C) outlines the requirement that the score of 76 or above must have been obtained on an individually administered, scientifically recognized, and standardized IQ test administered by a licensed psychiatrist or psychologist.

¶3 To enforce this provision and ensure these requirements are met, the trial court may, at the request of either party or on its own motion, hold a pre-Atkins hearing on a challenge to the validity of any IQ score of 76 or above. By allowing this challenge and making explicit what courts must consider when applying the 76 IQ score cut-off (including due consideration of the IQ test's scientific recognition), the statute complies with the requirements of Hall, Moore, and Brumfield.

¶4 I disagree with the Majority's use of the term "mental retardation" to draw a distinction between mental retardation and intellectual disability. The Majority cites no source to support this difference, and the Supreme Court has plainly stated that both terms refer to the same concept.[1] The Majority insists on using the terminology of this Court's prior case law even though both the Supreme Court and the Oklahoma Legislature have chosen to adopt the term "intellectual disability." This Court must interpret statutory language, and I see no reason why our case law should not reflect current statutes. I would adopt the term "intellectual disability" to maintain consistency with both the underlying statute and binding federal case law.

¶5 As to Proposition II, I agree that the good-faith exception to the Exclusionary Rule permits use of the CSLI data from Appellant's cell phone. The State's attempt to distinguish the facts in this case from those in Carpenter v. United States, 138 S.Ct. 2206 (2018), is unnecessary: even Mr. Carpenter was ultimately denied relief, due to the good-faith exception.[2] Laws are presumed to be constitutional. Arganbright v. State, 2014 OK CR 5, ¶ 15, 328 P.3d 1212, 1216. Because Carpenter announced a new interpretive rule, any court order for CSLI issued before Carpenter would almost certainly be similarly protected.[3]

¶6 Regarding Proposition IV, the gist of a Brady claim is that material, exculpatory information was withheld by the prosecution -- that is, the information was not known to the defense in time to use it at trial. Whether the information makes it into the appeal record depends on when the defense finally became aware of it. The Majority claims that the extra-record evidence Appellant submits in support of his Brady claim is not "part of the trial record." That much is apparent from the fact that Appellant wasn't aware of the information at the time of trial. The Majority then claims Appellant cannot supplement the record "at this juncture of the case," citing Rule 3.11(A) and (B) of this Court's rules on supplementing the record. In fact, the record can be supplemented at this juncture in various ways, including this Court's discretionary decision to permit supplementation under Rule 3.11(A), "upon notice from either party or upon this Court's own motion," "when necessary [] for a determination of any issue." Id. (emphasis added).[4] See Coddington v. State, 2011 OK CR 17, ¶ 21, 254 P.3d 684, 698.

¶7 In any event, the Majority proceeds to consider the supplementary material offered in support of the Brady claim, as it should under these circumstances. I agree that, even assuming for the sake of argument that Williamson hoped to receive leniency on his federal cases in exchange for his cooperation in this case, that motive was cumulative to what the jury already knew, and would not have been material to the outcome.

¶8 Propositions V and VI are premised on the idea that Appellant is entitled to discovery regarding his Brady claim. But Brady itself is, in essence, more powerful than any discovery rule. Rather than granting defendants a right to inspect material (which necessarily entails trial counsel's responsibility to actually do so), it imposes a unilateral obligation on the prosecution. I agree that Propositions VI and VII should be denied, because Rule 3.11 provides avenues for defendants to present colorable Brady claims at the direct-appeal stage.

FOOTNOTES

[1] In Hall v. Florida, 572 U.S. 701, 704 (2014), the Supreme Court addressed this very issue: "Previous opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe the identical phenomenon."

[2] After the Supreme Court remanded the case for further proceedings, the Sixth Circuit Court of Appeals came to the perfectly logical conclusion that the good-faith exception applied in Carpenter's case as well. United States v. Carpenter, 926 F.3d 313, 317-18 (6th Cir. 2019).

[3] See Illinois v. Krull, 480 U.S. 340, 350 (1987) ("If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written").

[4] Rule 3.11(A) provides:

After the Petition in Error has been timely filed in this Court, and upon notice from either party or upon this Court's own motion, the majority of the Court may, within its discretion, direct a supplementation of the record, when necessary, for a determination of any issue; or, when necessary, may direct the trial court to conduct an evidentiary hearing on the issue.

A Brady claim might also be reviewable on direct appeal through the filing of a Motion for New Trial based on newly-discovered evidence. See Rule 3.11(B)(3)(a). However, there are time limitations of the filing of a motion for new trial, and it appears Appellant did not meet those deadlines here.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2020 OK CR 16, KNAPPER v. STATE
Cited


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1988 OK CR 289, 766 P.2d 361, GILBERT v. STATE
Discussed
 1991 OK CR 126, 824 P.2d 385, BECK v. STATE
Discussed at Length
 1994 OK CR 40, 876 P.2d 690, SIMPSON v. STATE
Discussed at Length
 1994 OK CR 49, 879 P.2d 1234, CARTER v. STATE
Discussed
 1994 OK CR 70, 884 P.2d 1186, MITCHELL v. STATE
Discussed
 1995 OK CR 36, 900 P.2d 431, SPEARS v. STATE
Discussed at Length
 1995 OK CR 77, 909 P.2d 806, CARGLE v. STATE
Discussed at Length
 1996 OK CR 26, 919 P.2d 1130, HAIN v. STATE
Discussed
 2001 OK CR 1, 19 P.3d 294, 72 OBJ 371, HOOKS v. STATE
Cited
 2001 OK CR 9, 22 P.3d 702, 72 OBJ 1068, WILLIAMS v. STATE
Discussed at Length
 1975 OK CR 32, 532 P.2d 81, EDMONDSON v. STATE
Discussed
 2003 OK CR 6, 66 P.3d 456, MURPHY v. STATE
Discussed
 2004 OK CR 1, 84 P.3d 731, HARRIS v. STATE
Discussed
 2004 OK CR 2, 83 P.3d 856, RYDER v. STATE
Discussed at Length
 2004 OK CR 19, 89 P.3d 1124, DEROSA v. STATE
Discussed
 2004 OK CR 27, 98 P.3d 318, LOTT v. STATE
Discussed
 2006 OK CR 5, 128 P.3d 521, JONES v. STATE
Discussed at Length
 2006 OK CR 12, 133 P.3d 312, MYERS v. STATE
Discussed
 2006 OK CR 15, 134 P.3d 846, THRASHER v. STATE
Discussed at Length
 2006 OK CR 40, 144 P.3d 838, WARNER v. STATE
Discussed at Length
 2007 OK CR 16, 157 P.3d 1155, SMITH v. STATE
Discussed
 2007 OK CR 23, 164 P.3d 176, ANDREW v. STATE
Discussed at Length
 2007 OK CR 29, 164 P.3d 208, EIZEMBER v. STATE
Discussed
 2007 OK CR 34, 168 P.3d 185, MALONE v. STATE
Discussed at Length
 2009 OK CR 3, 202 P.3d 839, RUTAN v. STATE
Discussed
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed at Length
 2010 OK CR 23, 241 P.3d 214, CUESTA-RODRIGUEZ v. STATE
Discussed
 2010 OK CR 24, 245 P.3d 1233, SMITH v. STATE
Discussed at Length
 2011 OK CR 6, 248 P.3d 918, HARMON v. STATE
Discussed at Length
 2011 OK CR 12, 252 P.3d 221, UNDERWOOD v. STATE
Discussed
 2011 OK CR 3, 253 P.3d 969, GRISSOM v. STATE
Discussed at Length
 2011 OK CR 17, 254 P.3d 684, CODDINGTON v. STATE
Discussed at Length
 2011 OK CR 26, 270 P.3d 160, MITCHELL v. STATE
Discussed
 2011 OK CR 29, 268 P.3d 86, DAVIS v. STATE
Discussed at Length
 2011 OK CR 30, 267 P.3d 114, POSTELLE v. STATE
Discussed
 2012 OK CR 8, 281 P.3d 1283, MURPHY v. STATE
Discussed at Length
 2013 OK CR 5, 298 P.3d 1192, STATE v. DELSO
Discussed
 2014 OK CR 1, 319 P.3d 681, STATE v. MARCUM
Discussed
 2014 OK CR 5, 328 P.3d 1212, ARGANBRIGHT v. STATE
Discussed
 2016 OK CR 3, 371 P.3d 1100, MARTINEZ v. STATE
Discussed at Length
 2017 OK CR 8, 400 P.3d 781, DUCLOS v. STATE
Discussed
 2017 OK CR 10, 400 P.3d 834, BOSSE v. STATE
Cited
 2017 OK CR 12, 400 P.3d 786, FREDERICK v. STATE
Discussed at Length
 2018 OK CR 6, 419 P.3d 265, TAYLOR v. STATE
Discussed
 2018 OK CR 7, 419 P.3d 271, DAVIS v. STATE
Discussed
 2018 OK CR 10, 421 P.3d 890, NICHOLSON v. STATE
Discussed
 2018 OK CR 15, 422 P.3d 752, WILLIAMSON v. STATE
Discussed at Length
 2018 OK CR 19, 422 P.3d 788, BRAMLETT v. STATE
Discussed
 2018 OK CR 24, 424 P.3d 677, MITCHELL v. STATE
Discussed at Length
 2018 OK CR 31, 431 P.3d 929, BENCH v. STATE
Discussed at Length
 2019 OK CR 6, 442 P.3d 158, STEWART v. STATE
Discussed
 2000 OK CR 2, 993 P.2d 778, 71 OBJ 156, Dodd v. State
Discussed at Length
 2000 OK CR 11, 4 P.3d 702, 71 OBJ 1304, Bland v. State
Discussed
 1975 OK CR 133, 538 P.2d 1102, GEE v. STATE
Discussed
 1998 OK CR 10, 954 P.2d 774, 69 OBJ 669, Dewberry v. State
Discussed at Length
 1999 OK CR 15, 980 P.2d 1081, 70 OBJ 1223, Short v. State
Discussed
 1999 OK CR 33, 984 P.2d 813, 70 OBJ 2402, Martinez v. State
Discussed
 1985 OK CR 114, 706 P.2d 912, OWENS v. STATE
Discussed
 1987 OK CR 94, 737 P.2d 1206, SMITH v. STATE
Discussed
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 701.10b, Intellectual Disability - Death Penalty - Burden - Notice - Evidentiary Hearing - Standard of Review - Instructions
Discussed at Length
 21 O.S. 173, Definition of Accessories
Cited
 21 O.S. 701.7, Murder in the First Degree
Cited
 21 O.S. 701.8, Second Degree Murder
Cited
 21 O.S. 701.10, Sentencing Proceedings for First Degree Murder - State Seeking Death Penalty
Cited
 21 O.S. 701.12, Aggravating Circumstances
Discussed at Length
 21 O.S. 701.13, Review of Death Penalty Sentence
Discussed
 21 O.S. 953, Accomplice Testimony - Force of Same
Cited
 21 O.S. 1283, Convicted Felons and Delinquents
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 742, Testimony of Accomplice Requires Corroborating Testimony for Conviction
Cited
 22 O.S. 952, Grounds for Granting New Trial
Discussed


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA